FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

04 JUL -9 PM 4: 38

CLERK DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

**FEDERAL TRADE COMMISSION,**

> Plaintiff,

v.

**Case No.  8:03-cv-2353-T-17TBM**

**PEOPLES CREDIT FIRST, LLC, et al.,**

> Defendants.

_____/

### REPORT AND RECOMMENDATION

THIS MATTER is before the court on referral by the Honorable Elizabeth A. Kovachevich for a Report and Recommendation as to the entry of sanctions or a finding of civil contempt, see (Doc. 64), with respect to the **Receivers's Verified Motion for Entry of Order Directing Shaun Olmstead, Julie Connell, Thomas C. Little, Esquire, Billie Jo Pardee, and Dee Hoffman to Show Cause Why They Should Not be Held in Contempt of this Court for Willful Violations of the Court's Order** (Doc. 38).

I.

"Civil contempt proceedings are brought to enforce a court order that requires a party to act in some defined manner."  Chairs v. Burgess, 143 F.3d 1432, 1436 (11th Cir. 1998) (quoting Mercer v. Mitchell, 908 F.2d 763, 768 (11th Cir. 1990).  The movant bears the initial burden to "establish by clear and convincing evidence that the alleged contemnor[s] violated the court's earlier order."  United States v. Roberts, 858 F.2d 698, 700 (11th Cir. 1988).  Once

this prima facie showing of a violation is made, the burden shifts to the alleged contemnor[s] to produce evidence explaining their noncompliance at a show cause hearing. See Citronelle-Mobile Gathering, Inc. v. Watkins, 943 F.2d 1297, 1301 (11th Cir. 1991); Mercer, 908 F.2d at 768. At the show cause hearing, the alleged contemnor[s] must show "either that [they] did not violate the court order or that [they were] excused from complying." Mercer, 908 F.2d at 768. If this showing is met, the burden shifts back to the movant to show that compliance was possible. Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc., 950 F.2d 1525, 1529 (11th Cir. 1992).

II.

On November 10, 2003, the Federal Trade Commission (hereinafter "FTC") filed its Complaint against Shaun Olmstead, Julie Connell, Peoples Credit First, LLC, (hereinafter "PCF"), and Consumer Preferred, LLC, f/k/a Consumer First, LLC, (hereinafter "Consumer Preferred"), alleging that they engaged in false and misleading business practices constituting a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). That same day, the district court entered a Temporary Restraining Order with Asset Freeze and Other Equitable Relief (hereinafter "TRO"), and appointed Mark J. Bernet, Esq, as Receiver for PCF and Consumer Preferred.[1] See (Doc. 9). On November 12, 2003, the Receiver took physical possession of the business premises of PCF and Consumer Preferred. On December 17, 2003, the FTC and the Defendants, through their then attorney, Thomas C.

_____

[1]Collectively, PCF and Consumer Preferred are referred to herein as "the Receivership Defendants."

2

Little, Esq., entered into a Stipulated Order of Preliminary Injunction (Doc. 23), which the district court approved on December 23, 2003, (Doc. 26). On January 15, 2003, the Receiver filed his Verified Motion for Entry of Order Directing Shaun Olmstead, Julie Connell, Thomas C. Little, Esquire, Billie Jo Pardee, and Dee Hoffman to Show Cause Why They Should Not be Held in Contempt of this Court for Willful Violations of the Court's Order (Doc. 38). By his motion, the Receiver alleged that (1) Mr. Olmstead, Ms. Connell, Ms. Pardee, and Ms. Hoffman intentionally attempted to destroy original documents in the Receiver's possession, (2) Mr. Olmstead and Ms. Connell borrowed $30,000 from John Clements to pay Mr. Little's fee and cost retainer, and (3) Mr. Olmstead, Ms. Connell, and Mr. Little intentionally attempted to divest the court's jurisdiction over this case by initiating bankruptcy filings on behalf of six companies affiliated with the corporate Defendants.[2] On January 21, 2004, the district court entered an Order to Show Cause (Doc. 40).[3]

The evidentiary hearing on this matter began March 10, 2004. On April 15, 2004, the Receiver and Mr. Little filed a joint motion for approval of settlement and moved to vacate the order to show cause as it related to Mr. Little, which the court approved (Doc. 131). On April 21, 2004, the evidentiary hearing on the matter was concluded. At the close of the

---

[2]These limited liability companies are SoHo Holdings, Product Dynamics, Generation Housing, Foundation Commercial Properties, Nu Products d/b/a Royal Pineapple, and Dynamic Fulfillment & Services. Collectively, these companies are referred to herein as "the LLCs."

[3]Also in January 2004, the district court granted the Receiver's motion to extend the receivership to include Dynamic Fulfillment & Services. (Doc. 37). The Receiver has also filed motions to extend his receivership with respect to Nu Products d/b/a Royal Pineapple (R. 49); Foundation Commercial Properties (Doc. 79); and Product Dynamics, SoHo Holdings, and Generation Housing (Doc. 152). These matters are still pending.

3

hearing, the undersigned announced his conclusion that the Receiver had failed to establish by clear and convincing evidence that Mr. Olmstead, Ms. Connell, Ms. Pardee, and/or Ms. Hoffman wilfully violated the TRO by attempting to deface the document in the Receiver's possession. (Doc. 140 at 265-66). In light of this ruling, the undersigned directed counsel for the Receiver and Mr. Olmstead and Ms. Connell to submit findings of fact and conclusions of law with regard to the two remaining matters, namely, the transfer of the $30,000 and the filing of the bankruptcy petitions.[4]  Id.

III.

The Receiver first asserts that Mr. Olmstead, Ms. Connell, Ms. Pardee, and Ms. Hoffman violated Section IV.B of the TRO,[5] which prohibits the Defendants from destroying or altering documents in their possession, custody, or control that relate to the business practices or business or personal finances of any Defendant from April 2001 to present.[6]  In particular, the Receiver asserts that either Ms. Connell or Ms. Hoffman solicited Ms. Pardee to deface an original document by whispering, "scratch this out," and Ms. Pardee did in fact deface the document.[7]  In reliance on the court's ruling at hearing, the Defendants and Ms.

_____

[4]Counsel for Ms. Pardee and Ms. Hoffman were not required to file anything further on the matter as the remaining allegations did not involve them.

[5]For ease of reference, a copy of the TRO is attached to this Report.

[6]The Receiver also references Sections XI and XI.F of the TRO, which instruct the Defendants to fully cooperate with and assist the Receiver and prohibit them from interfering with or harassing the Receiver. TRO, §§ XI, XI.F.

[7]This event allegedly occurred during a document production at the Receiver's law firm on December 12, 2003, and was witnessed by the Receiver's legal assistant, John

4

Hoffman and Ms. Pardee do not respond to this argument. The Receiver argues in his proposed findings that upon the instructions of Ms. Connell or Ms. Hoffman, Ms. Pardee defaced the document. He further asserts that all four individuals heard the whispered instruction and none took any action to prevent the document from being defaced.

On this claim, I find the evidence tendered by the Receiver to fall woefully short of the clear and convincing proof necessary for a finding of contempt. The Receiver's alleged eyewitness, John Pelletier, actually saw nothing except that Ms. Connell, Ms. Hoffman, Ms. Pardee, along with Mr. Little, looked at the file which he later discovered contained the defaced document. When asked what he heard, Mr. Pelletier testified that he believed he heard someone say in a very low whisper "scratch this out," although he said he could not be sure what was said or who the speaker was. See (Doc. 140 at 85-86). The testimony also reveals that the documents were not kept in a secure location such that others would not have had access to the files. See id. at 45-46. Credible testimony further indicates that Mr. Pelletier was less than vigilant in his duties. Indeed, the testimony suggests that he was reading a book during a portion of the document review. See id. at 168, 205, 240, 243. Even if the Receiver is correct that these individuals had a motive to deface the evidence, such an incentive alone is insufficient to establish the allegations. Most significantly, I conclude that Mr. Pelletier's testimony lacks sufficient trustworthiness to warrant a finding of contempt.

---

Pelletier. See (Doc. 140 at 9-12). Mr. Little, Mr. Olmstead, Ms. Connell, Ms. Pardee and Ms. Hoffman were in attendance. Id. at 10. The document at issue is the personnel file of Mr. Clements, in which Mr. Olmstead's name was scratched out underneath the heading "immediate supervisor." See (Doc. 108, Receiver's Exh. 7).

Accordingly, I recommend that the Receiver's motion for a finding of civil contempt and/or sanctions be denied as to all individuals with respect to this particular allegation.

The Receiver next contends that Mr. Olmstead and Ms. Connell violated Section II of the TRO by obtaining a $30,000 loan from Mr. Clements to pay for Mr. Little's legal representation before the bankruptcy court. Section II of the TRO prohibits the Defendants from transferring, spending, or otherwise disposing of assets owned or controlled by, or in the actual or constructive possession of Defendants, their affiliates, or any other entity directly or indirectly controlled by Defendants. TRO, § II.A. It specifically prohibits the Defendants from "obtaining a personal or secured loan," and applies to "assets acquired after the effective date of this Order, including, without limitation, those acquired by loan or gift . . ." Id. at § II.B. By the Receiver's argument, Mr. Olmstead and Ms. Connell wilfully violated this section of the TRO by accepting Mr. Clements' $30,000 loan. (Doc. 141 at 19-20).

In response, Ms. Connell argues that there is insufficient evidence to prove that she violated the TRO by soliciting a loan or gift. In support of her argument, Ms. Connell points to Mr. Clements' testimony that the $30,000 was for Mr. Olmstead's benefit and Mr. Olmstead would be the only party responsible for repaying it. Additionally, Ms. Connell claims that her deposition testimony to the contrary resulted from confusion and, although this money was allocated to her and her companies for legal fees, she did not specifically request or direct that any money be paid on her behalf. (Doc. 143 at 4-6). As to Mr. Olmstead, he does not seriously argue that this transaction did not violate the TRO. Instead, he argues that the Receiver lacks standing to pursue this claim because neither the Receivership Defendants nor the Receiver has been injured. He also argues that the "loan" had the tacit approval of his

6

attorney, Mr. Little, and, if the loan was a violation of the TRO, it was a technical violation that did not diminish the funds available to the aggrieved consumers. (Doc. 144 at 12-13).

Here, I conclude that clear and convincing evidence establishes that Mr. Olmstead and Ms. Connell violated the TRO by soliciting and accepting $30.000 from Mr. Clements and the Receiver may properly claim injury and thus standing to contest the matter. The monies were delivered to Mr. Little and served as the seed money for his filing the several petitions for bankruptcy addressed below on behalf of the LLCs. See, e.g., (Doc. 119 at 50-57; Doc. 140 at 156). Whether the money was given to them as a "loan" or as a "gift" by Mr. Clements,[8] it was sought by both Mr. Olmstead and Ms. Connell, in clear violation of the TRO, so that they could pursue bankruptcy proceedings. Ms. Connell's testimony to the contrary was simply not credible. Even if the money was a gift as to her, she violated the TRO in pursuing this money. Thus, I recommend that the Receiver's motion for a finding of civil contempt and sanctions be granted as to Mr. Olmstead and Ms. Connell on this allegation.

By his last allegation, the Receiver contends that Mr. Olmstead violated Sections XI, XI.F, XII.B, and XII.E of the TRO by executing and causing to be filed the voluntary petitions for bankruptcy on behalf of SoHo Holdings, Product Dynamics, Generation Housing, and Foundation Commercial Properties. Similarly, he contends that Ms. Connell violated those same sections by executing and causing to be filed the voluntary petitions for bankruptcy on

---

[8]While Mr. Olmstead and Ms. Connell decline to label the money either a gift or a loan, the testimony from Mr. Clements and the surrounding circumstances suggest to me that it was an unsecured loan intended at some point to be paid back to Mr. Clements. Although Mr. Clements testified that Ms. Connell did not request the money and was not responsible for repaying it, the circumstances in which the loan was procured suggest otherwise.

behalf of Nu Products d/b/a Royal Pineapple (hereinafter "Nu Products") and Dynamic

Fulfillment and Services (hereinafter "DFS"). Section XI.F of the TRO prohibits the

Defendants from interfering with the Receiver with respect to any of his duties under the

TRO, including interfering with the exclusive jurisdiction of the Court over the assets of the

Receivership Defendants. In pertinent part, Section XII of the TRO provides that:

> . . . except by leave of this Court, during the pendency of the
> receivership ordered herein, the Defendants and all . . .
> principles, investors, . . . , stockholders, . . . , and other
> persons, seeking to establish or enforce any claim, right or
> interest against or on behalf of such persons, including
> attorneys, . . . , and their respective attorneys, servants,
> agents and employees be and are hereby stayed from:
>
> ***
>
> B.     Commencing, prosecuting, continuing or entering any
>        suit or proceeding in the name or on behalf of the
>        Receivership Defendants, or any of its subsidiaries or
>        affiliates;
>
> ***
>
> E.     Doing any act or thing whatsoever to interfere with
>        the Receiver taking control, possession or
>        management of the property subject to the
>        receivership, or to in any way interfere with the
>        Receiver, or to harass or interfere with the duties of
>        the Receiver, or to interfere with the exclusive
>        jurisdiction of this Court over the property and assets
>        of the Receivership Defendants, or its subsidiaries or
>        affiliates, including the filing by Defendants of a
>        petition for relief under the United States Bankruptcy
>        Code, 11 U.S.C. § 101 et. seq., as to the Receivership
>        Defendants.

TRO, § XII B., E. The TRO defines the Receivership Defendants as PCF and Consumer

Preferred. Id. at § X.

By the Receiver's argument, Mr. Olmstead and Ms. Connell violated these

provisions because they executed and caused the voluntary petitions for bankruptcy to be filed

on behalf of the LLCs, whom the Receiver alleges are affiliate companies of the Receivership Defendants, thus interfering with the Receiver and frustrating the exclusive jurisdiction of the Court.[9] In support of his argument, the Receiver points to the district judge's subsequent finding that DFS was an affiliate of the Receivership Defendants, Mr. Olmstead's decision to assert his Fifth-Amendment right against self-incrimination at the evidentiary hearing, and Ms. Connell's lack of credibility. (Doc. 141 at 20-23).

Both Mr. Olmstead and Ms. Connell respond that their conduct in causing the bankruptcy petitions to be filed cannot be found contemptuous because the TRO was ambiguous and unclear as to the filing of bankruptcy actions on behalf of entities other than the Receivership Defendants.[10] (Doc. 143 at 8; Doc. 144 at 9). Mr. Olmstead also argues that, while advice of counsel is not a defense to contempt, Mr. Little's belief that the bankruptcy filings did not violate the TRO illustrates that the TRO was sufficiently ambiguous to permit such filings. (Doc. 144 at 12). Ms. Connell argues that even if DFS and Nu Products were

---

[9]The Receiver concedes that the TRO does not define the term affiliate. In his contempt motion, the Receiver relied on the bankruptcy code's definition of an affiliate. (Doc. 38 at 8, n.3). In his proposed findings, he relies on the more general definition of affiliate set forth in Black's Law Dictionary (7th Ed. 1999), which provides that an affiliate is "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation." (Doc. 141 at 21). In turn, the Receiver relies on the same source to define a sister corporation as "[o]ne of two or more corporations controlled by the same, or substantially the same, owners." Id. Mr. Olmstead and Ms. Connell point out that the TRO does not define "affiliate." By their argument, the definition of "affiliate" is not particularly relevant as the TRO's definition of "Receivership Defendants" did not include affiliates. The Preliminary Injunction, issued after the bankruptcy petitions were filed, defines the "Receivership Defendants" to include affiliates, see (Doc. 24 at 3).

[10]In support thereof, Ms. Connell cites to McGregor v. Chierico, 206 F.3d 1378, 1383 (11th Cir. 2000), for the proposition that a finding of contempt cannot occur in the absence of a violation of a clear and *unambiguous* court order. (Doc. 143 at 4).

prohibited from filing for bankruptcy, the Receiver has failed to show by clear and convincing evidence that he was harmed by these filings. (Doc. 143 at 8-9). Ms. Connell also notes that Mr. Little testified that there was no preclusion of Nu Products or DFS filing bankruptcy petitions, and the bankruptcy judge denied the Receiver's motion for sanctions against her and Mr. Olmstead in connection with the filing of the bankruptcy petitions. (Doc. 143 at 3, 6).

Here, the evidence clearly establishes that Mr. Olmstead and Ms. Connell caused the petitions to be filed after consulting with their attorney, Mr. Little. According to Ms. Connell, the filings were made, not to defeat the Receiver, but instead to save the companies and permit them to move forward. (Doc. 140 at 152-53). According to Mr. Little, the peculiar wording of the applicable provision of the TRO left open the possibility of Mr. Olmstead and Ms. Connell seeking bankruptcy protection for companies other than the Receivership Defendants themselves,[11] thus the filings were appropriate and necessary to protect these LLCs and get them back in business despite the FTC action against the Receivership Defendants. Id. at 238, 251-52. Even if these assertions reveal a good faith intent on the part of Mr. Olmstead and Ms. Connell, I find the filings violated the clear language of the TRO where the petitions related to "affiliated" companies of PCF or Consumer Preferred.[12] The

---

[11]Thus, by his reading of the TRO at § XII.E, the Defendants were precluded from interfering with the "exclusive jurisdiction of the Court over the property and assets of the Receivership Defendants, *or its subsidiaries or affiliates,*" but because of the specific language addressing the filing of petitions for relief under the Bankruptcy Code mentioned only the "filing by Defendants of a petition for relief . . . as to the *Receivership Defendants*" (emphasis added), such relief could be sought by the LLCs.

[12]As the TRO did not define the term "affiliates," I look to the common definition and understanding of the term rather than that employed in the bankruptcy code. In this regard, I agree with the Receiver's current argument that the common meaning of "affiliate" should be used in the context of the issues presently before the Court.

10

TRO's broad prohibitions against interfering with the work of the Receiver and the

jurisdiction of the Court support this conclusion.  Thus, a fair reading of the TRO indicates

that the specific reference to filing bankruptcy in Section XII.E is illustrative only and is not

conclusive as to the limitations intended by that provision.  In my view, as to any of the LLCs

found to be affiliated with the Receivership Defendants, there is a violation of the TRO.[13]

At a minimum, the Receiver has demonstrated a close relationship between Mr.

Olmstead and Ms. Connell and the LLCs.  To this end, the testimony reveals that Ms. Connell

owned PCF.  She started the business in or about mid 2001, and it was financed in part by a

$100,000 loan from Mr. Olmstead.  (Doc. 140 at 126-28).  PCF provided a membership

program to consumers which permitted them to buy merchandise through web-sites and

catalogues.  Id. at 133-34.  PCF obtained its mailing lists, i.e., the names of perspective

customers to solicit, from Product Dynamics, a company owned by Mr. Olmstead.  Id. at 135,

151.  Although Mr. Olmstead was not employed at PCF, he assisted Ms. Connell in operating

the business, including consulting with her regarding business operations and executing a

lease on behalf of PCF.  Id. at 141, 149.

Ms. Pardee, a friend of Ms. Connell, owned Consumer Preferred.  (Doc. 140 at 129,

186).  Ms. Connell loaned Ms. Pardee money to start the business, which opened in or about

September 2002.  Id. at 186, 191.  Consumer Preferred was engaged in primarily the same

business as PCF.  Id. at 187.  It had one employee besides Ms. Pardee; the other services and

labor were provided by DFS.  Id. at 189.  Although Ms. Pardee was the president, Mr.

---

[13]Chief Bankruptcy Judge, Paul M. Glenn, appears to have read the TRO in the same
manner, finding that the filing of the bankruptcy petitions contravened the TRO.  See (Doc.
108, Receiver's Exh. 4).

Clements testified that at times he believed that Mr. Olmstead operated Consumer Preferred. (Doc. 119 at 62). In October of 2003, Ms. Connell sold her sole ownership interest in PCF to Consumer Preferred for $50,000. (Doc. 140 at 141-42, 187).

Ms. Connell started DFS in or about November 2002. (Doc. 140 at 125). She was its owner and president. Id. Mr. Clements, who was hired by Mr. Olmstead, was the general manager of DFS. (Doc. 119 at 39-40). At the time of DFS's inception, Ms. Connell transferred PCF employees to DFS, and after that, PCF had no employees. (Doc. 140 at 133). DFS's business involved providing fulfillment services to both PCF and Consumer Preferred. Id. at 147. As manager for DFS, Mr. Clements never made a major business decision without consulting with Mr. Olmstead. (Doc. 119 at 49). According to Mr. Clements, "PCF spun off DFS to do services for other companies." Id. at 44.

Mr. Olmstead owned and operated Product Dynamics, which provided PCF with consumer mailing lists. (Doc. 140 at 135, 150-51). Ms. Connell claims to own Nu Products, which began in or about April 2002. Id. at 161. It was established to market a skin care line under the name Royal Pineapple. (Doc. 119 at 73). According to Mr. Clements, Mr. Olmstead was actively involved in Nu Products and discussed with him matters related to its personnel, formulations, and marketing plans. Id. at 54. Mr. Clements also indicated that Nu Products was not, at the time of the receivership, making sufficient income to sustain itself and was using the assets and employees of DFS to meet its business needs. Id. at 76-77. According to the Receiver and not controverted by other evidence, Mr. Olmstead owned and operated Foundation Commercial Properties, which owned the Hale Avenue facilities out of which Mr. Olmstead and several of the companies operated. Id. at 108. It leased parts of the

buildings at this location to DFS, Consumer Preferred, and SoHo Holdings, (Doc. 140 at 62-63), and Ms. Connell had an office at this location (Doc. 119 at 86-87). The Receiver also indicated that Mr. Olmstead controlled and/or managed SoHo Holdings and Generation Housing, id. at 117. and that SoHo Holdings owned certain exotic cars, (Doc. 140 at 63).

Documentary evidence also establishes this interrelatedness. Business records regarding Consumer Preferred, DFS, PCF, and Nu Products were found in Mr. Olmstead's Hale Avenue office, and invoices directed to Product Dynamics, Foundation Commercial Properties, SoHo Holdings, and/or Mr. Olmstead were paid by PCF. See (Doc. 108, Receiver's Exhs. 10A-Q; Doc. 140 at 59-66). Although Ms. Connell denied involvement in the operation of Consumer Preferred, there is some reason to doubt this testimony. Documents seized at the Hale Avenue location suggest that she applied for a federal tax identification number on behalf of Consumer Preferred. See (Doc. 108 at Receiver's Exh. 14; Doc. 140 at 59-66). From this exhibit, it appears that such a number was issued to Ms. Connell by the IRS. (Doc. 140 at 72-73).

When considered in its entirety, the record clearly establishes the interrelationship of Mr. Olmstead to all of the LLCs and suggests that he likely had a financial interest in, or managing position in, each of the LLCs. As for Ms. Connell, there is a clearly established relationship at least with PCF, DFS, and Nu Products. As for the other LLCs, the evidence indicates they flowed from the successes of PCF and Consumer Preferred. The evidence also clearly indicates that PCF generated funds to support the various activities of Mr. Olmstead, Ms. Connell, and the LLCs. While the purpose or activities of Product Dynamics, Nu Products, and DFS may have been different from that of the Receivership Defendants, they

13

shared common ownership or management, and the intermingling of funds and personnel plainly reveals their relatedness to the Receivership Defendants and, thus, their business affiliation.

It is not necessary for me to conclude on this motion whether all of the LLCs should be considered affiliates of one or both of the Receivership Defendants. It is sufficient to conclude that DFS is affiliated with PCF and Consumer Preferred based on the credible evidence.[14] Ms. Connell's efforts to obtain relief in the bankruptcy court for this company violated the terms of the TRO. Likewise, Product Dynamics is an affiliated company of the Receivership Defendants. Mr. Olmstead's attempt to obtain relief in the bankruptcy court for this company likewise violated the TRO. I also conclude that the efforts of both Mr. Olmstead and Ms. Connell to obtain relief in the bankruptcy court for Nu Products violated the TRO. The provisions of the TRO are not so ambiguous to preclude such findings.[15] While I accept that the filing of the bankruptcy petitions was on the advice of counsel and this may have some bearing on the appropriate sanctions, it is no defense to contempt.

---

[14]The district judge already has determined that DFS is related to the Receivership Defendants. In particular, when ruling on the Receiver's motion to extend the receivership with respect to DFS, Judge Kovachevich found that DFS was an affiliate as "its sole purpose for existing was to serve as a conduit of funds from PCF and Consumer Preferred to entities owned and controlled by Olmstead or Connell." (Doc. 37 at 5).

[15]I do not find compelling the persuasive authority relied upon by Mr. Olmstead and Ms. Connell with respect to the "affiliate" issue. The cases they cite, FTC v. Para-Link Int'l, Inc., 2001 U.S. Dist. Lexis 17371 (M.D. Fla. 2001), and Gilchrist v. Gen. Elec. Capital Corp., 262 F.3d 295 (4th Cir. 2001), are factually distinguishable.

IV.

As a finding of contempt is warranted, it is necessary to address sanctions. District courts are afforded wide discretion in fashioning a remedy for civil contempt. McGregor v. Chierico, 206 F.3d 1378, 1385 n.5 (11th Cir. 2000) (citing United States v. City of Miami, 195 F.3d 1292, 1298 (11th Cir. 1999). Civil contempt sanctions serve one of two purposes: they may serve to coerce the contemnor to comply with a court order or compensate a party for losses suffered as a result of the contemnor's act. Id. Appropriate sanctions for civil contempt include (1) a coercive fine, (2) a compensatory fine, (3) attorney's fees and costs. and (4) coercive incarceration. Watkins, 943 F.2d at 1304. Civil contempt sanctions may not be used to impose what amounts to a punitive or criminal contempt sanction. Id. The complainant bears the burden of providing the court with the basic evidentiary facts to formulate a realistic sanction to which the Defendants could respond. In re Chase & Sanborn, Inc., 872 F.2d 397, 401 (11th Cir. 1989) (bankruptcy context).

As sanctions, the Receiver seeks the imposition of a fine as to both Mr. Olmstead and Ms. Connell in the amount of $50,000, an order directing Mr. Olmstead to surrender a GMC Denali vehicle, and an order granting his pending motions to expand the receivership to certain LLCs.[16] (Doc. 141 at 25). In total, the Receiver claims to have incurred fees or expenses in excess of $50,000. Thus, the Receiver asserts that he has expended approximately $32,000 in contesting the bankruptcy filings, $10,000 in seeking to expand his

---

[16]It is unclear whether the Receiver is seeking monetary sanctions to deter future conduct or as compensation. While he urges the court to order Mr. Olmstead and Ms. Connell to pay a fine, he does not specifically argue that the fine is coercive in nature. A fair reading of his argument reflects that he is primarily seeking compensation as he makes no argument that a monetary fine is needed to deter future conduct.

receivership to include certain affiliated LLCs, and $10,000 in litigating the contempt issues raised in his verified motion. (Doc. 141 at 16). He also claims that he has expended "substantial, additional sums" thereafter. Id.[17]

Both Mr. Olmstead and Ms. Connell generally argue that sanctions are inappropriate because compliance with the TRO is not an issue and the Receiver has not been harmed because he is going to be paid regardless of any award of fees/sanctions. Mr. Olmstead asserts that, while the Receiver has requested (originally) that he be required to pay $25,000, the Receiver has failed to establish an evidentiary predicate to support the imposition of a fine in this amount. With respect to the Receiver's allegation of document defacement, Mr. Olmstead argues that the Receiver should not be compensated for work performed on this allegation as it did not result in a finding of contempt. Citing to Hensley v. Eckerhart, 461 U.S. 424 (1983), and Norman v. Hous. Auth. of City of Montgomery, 836 F.2d 1292 (11th Cir. 1988), he points out that the Receiver has not identified the time he spent in his unsuccessful pursuit of this claim. As to the $30,000 advanced by Mr. Clements, Mr. Olmstead argues that even if it was a loan, it was not to be repaid until long after the litigation was concluded and therefore it did not diminish the funds available to aggrieved consumers. He also argues that the Receiver should not recoup fees on this allegation because the $30,000 was advanced with at least the tacit approval of Mr. Little. In regard to the bankruptcy filings, Mr. Olmstead argues that the Receiver should not be awarded fees related to such as the filings were not contumacious and they were made on the express advice of experienced

---

[17]These sums listed are said to have been incurred through March 10, 2004. Id. When the Receiver initially filed his motion, he sought monetary sanctions against Mr. Olmstead and Ms. Connell in the amount of $25,000 each. (Doc. 38 at 13).

bankruptcy counsel. Finally, Mr. Olmstead argues that any attorney's fees to be paid to the Receiver must be offset by the $30,000 he has already received from the settlement paid by Mr. Little. (Doc. 144 at 13-18).

Ms. Connell adds the FTC's concern that if successful on its complaint, any monetary sanctions paid from the frozen assets would reduce the amount available for consumer redress. She also contends that since the Receiver will recoup all expenses incurred in connection with his contempt motion, all the damages the Receiver claims to have suffered are punitive, not compensatory, in nature. Alternatively, she urges that even if the Receiver's damages are found to be compensatory in nature, the amount he seeks to recover is excessive, and mitigating factors exist. In support thereof, Ms. Connell asserts that the Receiver was not entirely successful in pursuing the bankruptcy matters because the bankruptcy judge denied his request for sanctions for bad faith filings. She also urges the court to consider as mitigating the fact that she relied on the advice of counsel with respect to the bankruptcy filings. (Doc. 143 at 12-13).

Two other factors underscore consideration of this matter. The first factor is that Mr. Little has entered into a settlement agreement with the Receiver with respect to these contempt proceedings. As set forth above, on April 19, 2004, the district judge entered an Order approving the settlement.[18] The second factor pertains to the bankruptcy proceedings themselves and the rulings entered by Judge Glenn with respect to the bankruptcy petitions

---

[18]According to the terms of the settlement, Mr. Little gave the Receiver $30,000 and did not make any admissions or admit to any liability. In exchange, the Receiver agreed to not pursue the contempt motion and the motion for sanctions pending in the bankruptcy court. See (Doc. 131).

17

filed on behalf of the six LLCs. Of note, Judge Glenn granted the Receiver's emergency

motion to dismiss the bankruptcy cases filed on behalf of DFS and Nu Products, finding that

the (1) filings were in violation of the TRO, and (2) cases were not filed for the purposes of

reorganization but to frustrate the district court litigation (bad faith filing). See (Doc. 108,

Receiver's Exhs. 3-4).[19]  However, on May 3, 2004, Judge Glenn denied the Receiver's

motion for sanctions against Mr. Olmstead and Ms. Connell in connection with the filing of

the bankruptcy petitions. See (Doc. 142 at 4 n.3, 12; Doc. 145 at 5 n.3).

    As a starting point, it is worth repeating that sanctions against a contemnor may be

ordered to force the contemnor to comply with the court's order or to compensate a party for

losses suffered as a result of the contemnor's act. I do not find that sanctions are warranted in

this case to force either Mr. Olmstead or Ms. Connell to comply with the TRO (now

Preliminary Injunction). As Ms. Connell points out, at least with respect to the bankruptcy

allegations, there is no need to impose additional penalties to deter future conduct as a plain

reading of the Preliminary Injunction makes clear that the refiling of any bankruptcy petition

on behalf of any of the six LLCs would likely violate the injunction, and one of the debtors

(DFS) is now under the control of the Receiver. Likewise, it does not appear that sanctions

are necessary in order to deter Mr. Olmstead or Ms. Connell from obtaining another unsecured

loan or gift of funds. Thus, the issue becomes one of compensation due the Receiver.

---

[19]Judge Glenn also dismissed the bankruptcy petitions filed on behalf of Generation Housing, Product Dynamics, and SoHo Holdings for the same reasons, and he dismissed the bankruptcy case involving Foundation Commercial Properties on the basis that its property was not insured. Id. All of the bankruptcy petitions were dismissed without prejudice.

To this end, the Receiver requests the fees and costs he incurred in litigating this contempt matter ($10,000), seeking to extend his receivership ($10,000), and challenging the bankruptcy filings ($32,000), as well as some undisclosed amount incurred after March 10, 2004. He does not submit to the court any documentary evidence detailing an accounting of the time expended, the hourly rate charged on each particular allegation, or proof of any associated costs.

Initially, I decline to recommend the Receiver be awarded any sum for work done in seeking to extend the receivership, as such is wholly independent from the instant contempt proceedings. For reasons set forth below, I also decline to recommend any additional fees and costs for work done before the bankruptcy court. As for the claim of $10,000 (plus) for litigating the contempt matter, this sum reflects the work the Receiver performed in connection with the document defacement, the $30,000 loan from Mr. Clements, and the bankruptcy filings. Based on my findings with respect to these matters, compensation to the Receiver measured by the fees and costs incurred in prosecuting this matter appears to be the appropriate sanction.

With respect to the proceedings in the bankruptcy court, the Receiver claims expenditures of approximately $32,000 in contesting the Defendants' bankruptcy filings. In considering appropriate sanctions with respect to this issue, due consideration must be given Judge Glenn's findings, as well as Mr. Little's settlement agreement with the Receiver. While it is important to reiterate that Judge Glenn found that these were bad faith filings, he denied the Receiver's request for sanctions in the bankruptcy proceedings. It is also worthy of note that the Receiver has already been paid $30,000 from Mr. Little in connection with the

19

bankruptcy and contempt proceedings, monies of which *do not* decrease the amount of the frozen assets. For the Receiver to seek nearly the same amount from Mr. Olmstead and Ms. Connell is unabashedly avaricious. To award the Receiver that amount would be impermissibly punitive and amount in a windfall to the Receiver.

As to the litigation in this court surrounding the instant motion, the first allegation of defacement of the document has not been established. Thus, I conclude that sanctions are unwarranted on this ground. Stated otherwise, the Receiver is not entitled to recoup fees and expenses as related to this allegation. See, e.g., Matter of Trinity Indus., Inc., 876 F.2d 1485, 1495 (11th Cir. 1989); McKelvy v. Metal Container Corp., 125 F.R.D. 179, 184 (M.D. Fla. 1989). Accordingly, I recommend that the Receiver's motion for sanctions against all named individuals with respect to this alleged contemptuous act be denied. I further recommend that the $10,000 amount sought by the Receiver as compensation for bringing his contempt motion (and for work performed before March 10, 2004) be reduced by one-third.[20]

Regarding the other two claims litigated before this court, I find no basis to reduce the Receiver's claim for fees and costs. Contrary to Mr. Olmstead's argument, I do not find advice of counsel as a mitigating factor with respect to the $30,000 loan. As to Ms. Connell's assertion, while it appears likely that the loan did not diminish the funds available to aggrieved consumers, that argument ignores that soliciting the loan did in fact violate the TRO and that the Receiver is entitled to compensation for the work he undertook as to that claim. Additionally, monies paid to this end need not diminish funds available to aggrieved

---

[20]Because the Receiver has failed to itemize his expenditures, I am unable to more particularly reduce this claim.

20

consumers as the monies need not be paid out of the frozen assets. However, I agree with Ms. Connell that the Receiver should not be able to double dip, i.e, he should not be awarded compensation in connection with this motion and then seek the same compensation out of the frozen assets. As to the bankruptcy filings, while reliance on counsel may mitigate the damages a court may award in a contempt proceeding, see SEC v. First Fin. Group of Tex., Inc., 659 F.2d 660, 670 (5th Cir. 1981), I do not find it be a strong mitigator in this case. As Judge Glenn noted, there is no indication that the bankruptcy petitions were filed for purposes of reorganization and/or protecting the LLCs. Rather, despite Defendants' arguments to the contrary, it appears to me that the filings were made with the clear understanding that they would frustrate the district court proceedings. Accordingly, I find that the Receiver is entitled to compensation for work performed in connection with these two contemptuous actions. The amount to be awarded would include $6,666.66 for work performed before March 10, 2004, and the reasonable fees and costs incurred thereafter on this motion. Unfortunately, such amounts are not before the court.

## V.

Accordingly, for the reasons more thoroughly stated above, it is RECOMMENDED that an Order be entered with the following findings:

(1)     That Ms. Pardee and Ms. Hoffman did not violate the TRO and therefore are not in contempt of court;

(2)     That Mr. Olmstead and Ms. Connell violated the TRO by procuring a $30,000 loan from Mr. Clements and causing bankruptcy petitions to be filed

on behalf of DFS, Product Dynamics, and Nu Products and therefore are in contempt of court;

(3) As sanctions for this conduct, the Receiver is entitled to compensation in the amount of $6,666.66 with respect to work and expenses related to these contempt proceedings through March 10, 2004, and such additional sums reasonably incurred as fees and costs thereafter on this motion;[21] and

(4) That Mr. Olmstead and Ms. Connell shall be jointly and severally liable for such sums as are ultimately awarded the Receiver. Such amounts shall be payable from their personal property, not from the frozen assets.[22]

Respectfully submitted on this
9th day of July 2004.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

---

[21]Such additional amounts shall be itemized by the Receiver and submitted for consideration by the court within the ten day objection period set forth below. In the event the Receiver has already been compensated for this work, such sums as are ordered to be paid shall be held by the Receiver for the benefit of the Receivership Defendants.

[22]To the extent that the Receiver additionally seeks to have Mr. Olmstead immediately and permanently surrender title and possession of his 2002 GMC Denali XL to the Receiver, civil contempt sanctions may not be used to impose what amounts to a punitive or criminal contempt sanction. See Watkins, 943 F.2d at 1304. Accordingly, I respectfully recommend that his request for such as a sanction be denied. The matter of extending the injunction to all the LLCs is better left to the court's consideration on the pending motions.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; see also Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
United States District Judge
Counsel of Record