**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**FEDERAL TRADE COMMISSION,**

    **Plaintiff,**

**v.**                                                                **Case No. 8:03-cv-2353-T-TBM**

**PEOPLES CREDIT FIRST, LLC, et al.,**

    **Defendants.**
_____/

**O R D E R**

THIS MATTER is before the court on the following motions:

(1) **Plaintiff's Motion for Summary Judgment** (Doc. 261) and Brief in Support (Doc. 263); Defendant Shaun Olmstead's response in opposition (Doc. 305); and Defendants, Peoples Credit First, LLC and Consumer Preferred, LLC's response in opposition[1] (Doc. 306);

(2) **Defendant Shaun Olmstead's Motion for Summary Judgment** (Doc. 288) and Plaintiff's response in opposition (Doc. 302); and

(3) **Consumer Preferred, LLC and People's Credit First, LLC Motion for Summary Judgment** (Doc. 296) and Plaintiff's response in opposition (Doc. 303).

The parties have filed exhibits in support of their pleadings, including depositions, affidavits and declarations, hearing testimony, consumer complaints, letters, and other documentary evidence.[2] Oral arguments on the motions were conducted on September 8, 2005.

---

[1] Defendant Julie Connell joins in this opposition. (Doc. 308).

[2] Plaintiff also relies on adverse inferences drawn from Mr. Olmstead's invocation of his Fifth Amendment privilege in response to certain questions at hearing and deposition.

I.

A.

A brief procedural overview proves useful. On November 10, 2003, Plaintiff filed this action against the Defendants alleging that they engaged in false and misleading business practices constituting deceptive acts or practices in violation of Section 5(a) of the Federal Trade Commission Act (hereinafter "FTC Act), 15 U.S.C. § 45(a). In particular, Plaintiff alleged in its one-count Complaint that Defendants did so by representing in direct mail letters that by paying a fee, consumers would, or were highly likely to, receive a major credit card. (Doc. 1, ¶¶ 15-17). That same day, the court entered a Temporary Restraining Order (hereinafter "TRO") with Asset Freeze and Other Equitable Relief, and appointed Mark J. Bernet, Esq., as Receiver for People's Credit First , LLC, and Consumer Preferred, LLC. (Doc. 9). On or about November 12, 2003, the Receiver took physical possession of the business premises of the corporate Defendants. On December 17, 2003, the FTC and the Defendants entered into a Stipulated Order of Preliminary Injunction (Doc. 23), which the court approved on December 23, 2003 (Doc. 26). On January 14, 2004, the court extended the Receivership to include Dynamic Fulfillment & Services, LLC. (Doc. 37). On November 12, 2004, the court extended the Receivership to include Foundation Commercial Properties, LLC; Product Dynamics, LLC; SoHo Holdings, LLC; and Generation Housing, LLC. (Docs. 280, 285). On November 24, 2004, the court extended the Receivership to include Nu Products, LLC, d/b/a Royal Pineapple. (Doc. 304). In June 2005, subsequent to the filing of the instant motions, the district judge ruled that the consumer declarations, complaint summaries and consumer complaints relied upon by Plaintiff in obtaining the TRO and

2

Preliminary Injunction were admissible evidence for the purposes of the pending motion[s] and at trial. (Doc. 386). In September 2005, the parties consented to have the undersigned conduct any and all further proceedings in this matter (Doc. 412).

B.

The undisputed facts establish that the Federal Trade Commission (hereinafter "FTC" or "Commission") is an agency of the United States government. Among other duties, the Commission is charged with enforcing Section 5(a) of the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce. Defendant Peoples Credit First, LLC (hereinafter "PCF") is a Florida corporation heretofore transacting business out of offices in Tampa, Florida. Defendant Consumer Preferred, LLC (hereinafter "CP"), formerly known as Consumer First, LLC, (hereinafter "Consumer First"), is also a Florida corporation heretofore transacting business out of offices in Tampa, Florida. Defendant Shaun Olmstead is an individual residing in the Middle District of Florida. At all pertinent times, Mr. Olmstead has directed, controlled, and/or participated in the business activities of PCF and CP and several related entities. Defendant Julie Connell is a resident of the Middle District of Florida. At all pertinent times, Ms. Connell also has exercised, controlled or participated in the affairs of PCF and CP and related entities.

Since about May 2001, PCF and/or CP have purported to engage in the business of selling memberships in a buyer's club. Members were solicited by mass mailings, which ultimately totaled in the millions. Typical of the solicitations was the "Acceptance Certificate." See (Ex. 1 comp. to the hearing). By such certificate, a named consumer was advised as follows:

>    DEAR _____,
>
>    CONGRATULATIONS, YOU ARE GUARANTEED APPROVAL FOR A PEOPLES CREDIT FIRST PLATINUM CARD WITH A CREDIT LINE OF $5,000.00. THIS IS NOT A "MAYBE." WE HAVE ALREADY RESERVED A CARD IN YOUR NAME.
>
>    TO RECEIVE YOUR NEW PLATINUM CARD PLEASE SIGN AND MAIL THIS GUARANTEED ACCEPTANCE CERTIFICATE AND INCLUDE YOUR ONE-TIME ONLY $45.00 MEMBERSHIP FEE. ONCE WE RECEIVE THIS FORM WITH YOUR MEMBERSHIP FEE, YOUR PLATINUM CARD WILL BE SENT TO YOU. COMPLETE DETAILS FOR YOUR MEMBERSHIP WILL BE INCLUDED WITH YOUR PLATINUM CARD.
>
>    YOU MAY USE YOUR PLATINUM CARD IMMEDIATELY UPON RECEIPT FOR ALL PURCHASES FROM CREDIT PROVIDER.
>
>    PEOPLES CREDIT FIRST PROVIDES A 30-DAY GUARANTEE OF MONEY BACK. IF YOU ARE NOT COMPLETELY SATISFIED, PLEASE RETURN YOUR NEW PLATINUM CARD AND MEMBERSHIP PACKAGE WITHIN 30-DAYS AND YOUR GUARANTEE OF MONEY WILL BE REFUNDED-NO QUESTIONS ASKED . . .
>
>    SINCERELY,
>
>    /s/ MR. ROBERT STEVENS
>    APPROVAL DEPARTMENT[3]

Additionally, the consumer was advised, "NO APPLICATION OR CREDIT CHECK IS NECESSARY WHEN CARDHOLDER SIGNS THIS ACCEPTANCE CERTIFICATE. PLEASE SEE TERMS AND CONDITIONS INCLUDED IN YOUR MEMBERSHIP PACKAGE." Also, above the consumer's signature line the letter stated, "YES, send my new PLATINUM CARD. I understand that my approval is GUARANTEED with a $5,000.000

---

[3] This name was on the earlier Acceptance Certificates. Later Acceptance Certificates had only an illegible signature above the words "Approval Department."

4

CREDIT LIMIT AND A 12 MONTH 0% APR. . . ." The consumer could choose to pay an additional $4.00 to "<u>RUSH</u> PROCESSING AND DELIVERY."

When a consumer responded to the acceptance certificate by signing it and forwarding the $45 or $49 fee, he or she thereafter received a membership package that included a merchandise catalog, ordering instructions, and a platinum colored card with which to make purchases. Over a two and half year period, PCF and/or CP mailed approximately 10 million of such solicitations to consumers throughout the United States. (Doc. 45, Ex. B; Plf's Ex. 70 at ¶ 24[4]). More than 200,000 consumers responded to the acceptance certificate by mailing in a membership fee to PCF or CP. (Doc. 35 at 11, ¶ D;[5] Doc. 37 at 3, ¶ 5; Ex. 70 at ¶ 24). Gross sales by PCF and CP topped $11 million. After refunds, net proceeds equaled $10,156,700.40.[6] (Plf's Ex. 70 at ¶ 24;[7] Plf's Exs. 76-77).

PCF was formed by or at the direction of Mr. Olmstead in or about May 2001. (Doc. 35 at 10, ¶ C(1)(A); Doc. 45 at 8, ¶ 28). Evidence reflecting on his control of this company establishes that Mr. Olmstead provided start-up money for PCF, executed leases on behalf of PCF, arranged telephone lines for PCF, and supervised the hiring and the activities of PCF employees. (Doc. 168 at 11; Plf's 70, ¶ 10; Plf's Ex. 75, Exs. 8, 12; Plf's Ex. 78 at 59). The

---

[4] Exhibits to the FTC's Motion for Summary Judgment (Doc. 261) are numbered 70-80 and cited herein as Plf's Ex. __.

[5] The statements set forth in the Receiver's Initial Report (Doc. 35) were later verified in a supplement thereto. <u>See</u> (Doc. 251 at 5).

[6] At oral arguments, counsel for the Defendants indicated that they did not dispute these calculation on this motion.

[7] Mr. John Clements attested that the total amount received from customers through solicitations was "approximately $9 million." (Plf's Ex. 70 at ¶ 24).

solicitation letters employed by PCF were designed by Mr. Olmstead and Ms. Connell.  (Doc. 6, Ex. 40 at ¶ 5; Doc. 140 at 140-41; Plf's Ex. 78 at 63-65).  Mr. Olmstead's company, Products Dynamics, LLC, supplied the mailing list for consumers to PCF, printed the solicitation letters, and mailed the letters to consumers.  (Doc. 45 ¶¶ 31, 32, & Exh. B; Doc. 140 at 193; Doc. 168 at 11).  Ms. Connell was installed as President of PCF by Mr. Olmstead and maintained an active role in its day to day business.  (Plf's Ex. 70 at ¶¶ 8-14, Plf's Ex. 72 at ¶ 7, Plf's Ex. 78 at 58-59).  Although Ms. Connell was President of PCF, she continued to rely on Mr. Olmstead's assistance in operating the business.  See (Doc. 140 at 141, 149**;** Doc. 168 at 11; Plf's Ex. 70 at ¶ 13; Plf's Ex. 78 at 63-76).  Mr. Olmstead hired John Clements as the general manager of PCF.  (Plf's Ex. 70 at ¶ 6).

      CP was formed at about the time PCF ceased mailing solicitation letters, which was in or about September 2002.  (Doc. 35 at 10; Doc. 168 at 11; Plf's Ex. 78 at 93-94; Plf's Ex. 79 at 35).  Evidence indicates that Mr. Olmstead was active in the formation and daily operations of CP.  (Doc. 35 at 10; Plf's Ex. 70, ¶¶ 21-22, 37).  Ms. Connell's friend, Billie Jo Pardee, was president of CP.  (Doc. 168 at 11).  The business of CP appears the same as that of PCF.  (Doc. 140 at 187; Doc. 168 at 11; Plf's Ex. 70, ¶ 18; Plf's Ex. 78 at 94).  Its mailing lists for consumers were provided through Mr. Olmstead's company, Product Dynamics.  See (Doc. 35 at 11; Doc. 45, ¶¶ 31-32; Doc. 140 at 193; Doc. 168 at 11-12).  Ms. Connell's company, Dynamic Fulfillment & Services (hereinafter "DFS"), supplied CP with its employees who performed the business functions of CP.  (Plf's Ex. 70, ¶ 16; Plf's Ex. 78 at 93-94, 112-14).  DFS developed training manuals that were used by CP's employees in dealing with consumer questions, complaints and inquiries.  (Plf's Ex. 70, Ex. 16).  Ms.

Connell was paid for supplying CP with consumer mailing lists through a separate business at Source Lists. (Doc. 35 at 11; Doc. 45, ¶ 31; Plf's Ex. 79 at 50). The evidence supports that Ms. Connell was actively involved in operating CP and relied upon Mr. Olmstead in operating the business.[8]

Evidence also supports that PCF and CP made at least a passing effort to operate as a buyer's club. The terms and conditions of the buyer's club were posted on web sites, which indicated that buyers would get a membership card and not a Visa or Mastercard. (Doc. 305, Ex. 2 at ¶ 8). Some individuals responding to the mailings and/or the web site used their Platinum Cards to make purchases of merchandise. According to William Hanson, a computer specialist employed by PCF and/or DFS from October 2001 through November 2003, there were 1,082 orders for merchandise totaling $394,119.71 during a four-month period in 2003.[9] Id., Ex. 1 at ¶ 13. Furthermore, Mr. Hanson indicated that they "were constantly in the process of new enhancement and integration of new ideas to enhance the system to improve the information and service to the members," including the purchase of a $30,000 Pitney Bowes Accent System installed to correct the delays in sending out orders. (Doc. 305, Ex. 1 at ¶ 10). Additionally, a test run was performed in which 3,000 acceptance

---

[8]At arguments, counsel for Mr. Olmstead and Ms. Connell announced that they were not contesting the evidence of their client's control and active participation in the business of either PCF or CP.

[9]It is undisputed, however, that the majority of buyers never paid for their merchandise and that little was done by behalf of the Defendants to collect what was owed. (Doc. 78 at 85-86; Plf's Ex. 70 at ¶¶ 13-14, Ex. A; Plf's Exs. 76-77). In addition, call statistics for a one-week period in late 2003 documented only 65 out of 793 telephone calls to PCF and CP concerned order inquires or payments by phone. (Doc. 119, Ex. 10.g).

certificates were mailed out that included the additional statement, "This is not a Visa or Mastercard." Michael Dunn, the owner of the direct mail company that performed the test run, testified that he was skeptical of the mailer because he thought persons receiving it would believe the opposite.[10]  (Doc. 305, Ex. 3 at ¶¶ 4, 9-10).  According to Mr. Hanson, most consumer complaints did not relate to the fact that they had not received a major credit card.  (Doc. 305, Ex. 1 at ¶ 5).

Undisputed evidence also supports that PCF and CP received a number and variety of customer complaints.  Internal company documents reveal customer calls regarding shipping delays, check holds, refund requests, and not receiving a general use credit card.[11]  (Plf's Ex. 70, Exs. 12-13).  A customer service representative of PCF, Linda Hanson, claimed she received "no less than 200 complaints regarding PCF and Consumer First each day."  (Plf's Ex. 72).[12]  Many of the callers would complain about not receiving a major credit card.  Id.; see also Decl. of Breeze Giacoletto (Plf's Ex. 73).  A "Customer Service Agent Training Module" for DFS employees listed "Common Rebuttals" for certain complaints from

---

[10]Mr. Dunn also provided mailing services for PCF and CP.  (Doc. 305, Ex. 3 at ¶ 3).

[11]The parties dispute the number of these calls that were from customers upset because they did not receive a major credit card. According to Ms. Pardee, approximately 20% of the customer complaints were from consumers who thought they that they were receiving a general purpose credit card.  (Doc. 305, Ex. 8).  By Mr. Hanson's account, the largest number of complaints involved delayed delivery and check holds.  (Doc. 305, Ex. 1).  By Mrs. Hanson's account, the majority of complaints were about delays in receiving membership packages or merchandise ordered.  (Doc. 305, Ex. 4).

[12]At arguments, Defendants disputed this statement, at least to the extent that Ms. Hanson fielded 200 calls a day, and urged that the call lists demonstrate that most of the complaints dealt with customer service, and, in any event, most of the people who purchased a membership never complained at all.

consumers with a PCF or CP account (i.e., those consumers who sent in their $45 or $49). These included, among others, "[t]his is not want I wanted or expected, or I wanted a major credit card. . . . I want a refund. I still want a refund. . . . I am going to contact the BBB. I am going to have my attorney call you . . ." (Plf's Ex. 70, Ex. 16). It also included a section on how to overcome objections when the customer complained that he or she did not get a credit card. The training module, as well as a condensed "Cheat Sheet," provided the customer service representatives with scripted responses to those complaints. Customer service representatives were also instructed not to offer refunds unless requested. (Doc. 35, Ex. I; Doc. 119, Ex. 11). According to the Receiver, he discovered "literally thousands of documents constituting written complaints from consumers who claim to have been mislead" and "very substantial numbers of written inquiries and complaints from [various consumer protection agencies]." (Doc. 35 at 12).

Consumers also complained of fraud and deception to the Better Business Bureau of West Florida (hereinafter "BBB"), the Florida Department of Agriculture and Consumer Services, the Florida Department of Financial Services, and the Consumer Sentinel database. (Doc. 6, Ex. 3 at ¶ 3). By June 2003, the BBB had received no less than 267 written complaints against PCF and approximately 179 written complaints against CP. (Doc. 6, Ex. 9 at ¶¶ 6, 13). According to Bethany Roza, a Trade Practice Specialist for the BBB who reviewed the complaints,

> . . . . The majority of the complaints concern
> misrepresentations in the selling practices of [PCF and CP].
> Consumers believe they are being offer a major credit card,
> like a Visa, and complain to the BBB that they do not
> receive the major credit card they believe they are promised.
> According to the complaints on file, consumers receive a

9

> letter in the mail from [PCF or CP] which offers them a
> guaranteed platinum card with a large credit limit.
> Consumers are asked to return the letter along with an
> activation fee of $45, or $49 for rush deliver. Consumers
> who pay this fee complain to the BBB that they do not
> receive their major credit card. Instead, [PCF or CP] sends
> them a package which contains a plastic card and catalogue
> which they can use to order merchandise.

(Doc. 6, Ex. 9 at ¶¶ 8-9, 15-16). Nineteen declarations from consumers such as those are presently before the court.[13] Id., Exs. 25-28, 30-33, 35-38, 41-47. Essentially, each consumer stated that he or she sent either $45 or $49 to PCF or Consumer First or CP because they believed they were obtaining a major credit card such as a Visa or MasterCard. When they learned otherwise, they believed that they had been deceived. In addition to the written complaints, the BBB received over 20,000 telephone and internet inquiries from consumers seeking information on PCF and CP. Id., Ex. 9 at ¶¶ 7, 14. Both PCF and CP were identified by this organization as businesses having "an unsatisfactory record based on consumer complaints which allege false and misleading selling practices . . . and a pattern of failing to eliminate the basic cause of the complaints." Id. at ¶¶ 11, 19.

C.

By its motion for summary judgment, the FTC argues the evidence is undisputed that the Defendants violated Section 5(a) of the FTC Act by representing through their mail solicitations that, by paying a $45 or $49 fee, consumers would receive or were likely to receive a major credit card. It seeks injunctive relief, restitution, and an award of attorney's fees and costs. In response, and by way of their motions for summary judgment, Defendants

---

[13]The FTC actually submitted twenty-two consumer declarations. However, two were not submitted by the recipient of the mailer but by their spouse, and one consumer did not send in any money. See (Doc. 6, Exs. 29, 34, 39).

10

assert they are entitled to summary judgment because the undisputed evidence demonstrates that their acceptance certificate did not have a tendency to mislead reasonable consumers. In the alternative, Defendants argue that summary judgment is inappropriate because there exists a significant factual dispute as to whether their solicitations were misleading. By their contention, the company legitimately sold memberships in a buyers club, and while there may have been some disgruntled consumers, the overwhelming majority of customers never complained about the product.

II.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court may look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in determining whether summary judgment is appropriate. Fed. R. Civ. P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. See Celotex, 477 U.S. at 324; Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. See Perkins v. Sch. Bd. of Pinellas County, 902 F. Supp. 1503 (M.D. Fla. 1995).

It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." Hairston, 9 F.3d at 919 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. See id. at 921; see also Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. See Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997).

### III.

### A.

Section 5(a) of the FTC Act provides in pertinent part that "deceptive acts or practices in or affecting commerce" are unlawful.[14] 15 U.S.C. § 45(a)(1), (2). To establish that an act or practice is deceptive, the FTC must show that (1) there was a representation or omission, (2) the representation or omission was likely to mislead consumers acting

---

[14]The parties do not address (or dispute) that the Defendants' direct mailing of the acceptance certificates affected commerce. The court finds that the Defendants' nationwide direct mailing scheme constitutes acts or practices in or affecting commerce under the FTC Act. See FTC v. Think Achievement Corp.,144 F. Supp. 2d 993, 1009 (N.D. Ind. 2000) (citing Ford Motor Co. v. FTC, 120 F.2d 175, 183 (6th Cir. 1941)).

12

reasonably under the circumstances, and (3) the representation or omission was material. FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988).

Even when viewed in a light most favorable to Defendants, the court finds that the undisputed evidence establishes that the Defendants made material representations, express or implied, that were likely to mislead reasonable consumers. First, it cannot be disputed that the acceptance certificate itself contains several express representations, and as Plaintiff demonstrates, the misrepresentations mislead many in the consuming public. When fairly and reasonably viewed as a whole, the acceptance certificate had both express and implied representations: (1) it expressly represented that the consumer would get a platinum card with a 0% annual percentage rate and a $5,000.00 credit limit without application or credit check simply by paying $45.00 (or $49.00); and (2) it implied that the platinum card the consumer would receive upon payment was a credit card.[15] While Defendants rely on the truthfulness of the words in the acceptance certificate to rebut Plaintiff's assertion, the court is not persuaded. The fact that the words on the acceptance certificate are technically or literally true is not

---

[15]At arguments, Plaintiff's counsel maintained that it need demonstrate either a misrepresentation *or* omission. But in counsel's view, these circumstances encompass both express and implied misrepresentations. "So we can say they made express representations like platinum card, like APR, like guaranteed that you'll receive up to $5,000 worth of credit, those kinds of things, which are themselves representations, but overall we're saying that this is a deceptive ad because it – it shows the consumer – leads the consumer to believe that they're going to receive a major credit card. . . - the express representation is that they're going to get a platinum card with zero APR and a $5,000 credit limit when, in fact, what they get is a piece of plastic that just happens to be platinum. . . . The stronger argument is that it's an implied representation that they going to actually get a major credit card, but they do that by making those express statements." See (Doc. 444 at 4-6). Defendants maintain that the representations are true and by the plain language do not promise a major credit card like Visa as alleged.

13

controlling.  See Removatron Int'l Corp. v. FTC, 884 F.2d 1489, 1496 (1st Cir. 1989) (stating that courts must focus on "[t]he impression created by the [representation], not its literal truth or falsity . . .") (quoting Am. Home Prods. Corp. v. FTC, 695 F.2d 681, 687 (3d Cir. 1982)); Think Achievement Corp., 144 F. Supp. 2d at 1009-10 (stating that a representation may be deceptive even if the constituent words are literally or technically true).

Here, notwithstanding the express representations made in the acceptance certificate, the implication from the entirety of the certificate was that the consumer was approved for and would receive a credit card with a $5,000 credit limit upon payment.  Relying on the fact that the top of the certificate clearly defined "CREDIT PROVIDER" to be either PCF or CP, the fee involved was referred to as a "Membership Fee," and that the words "credit" and "card" do not appear together, Defendants urge at minimum that a contrary inference is reasonable as well, i.e., what is being offered is a membership in a buyer's club, such that the matter may not be resolved on these motions.[16]  The court disagrees.  See FTC v. Wilcox, 926 F. Supp. 1091, 1098 (S.D. Fla. 1995) (noting, in direct mail context, that deception may be accomplished by innuendo rather than by outright false statements) (quoting Regina Corp. v. FTC, 322 F.2d 765, 768 (3rd Cir. 1963)).  Additionally, whether a representation is likely to mislead reasonable consumers must be determined "'by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.'"  Removatron Int'l Corp.,

---

[16]Defendants rely on FTC v. Mktg. Response Group, Inc., No. 96-111-CIV-T-17A, 1996 WL 420865 (M.D. Fla. June 24, 1996), and Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General, 761 So.2d 1256 (Fla. 3d DCA 2000).  Those cases are distinguishable as each involved a preliminary injunction.

884 F.2d at 1496 (advertising context) (quoting Beneficial Corp. v. FTC, 542 F.2d 611, 617 (3d Cir. 1976)).  Moreover,

> [t]he important criterion in determining the meaning of an advertisement [or representation] is the net impression that it is likely to make on the general populace.
>
> \*\*\*
>
> [t]he determination is not restricted to a consideration of what impression an expert or careful reader would draw from the advertisement [or representation], but rather involves viewing the [representation] as it would be seen by the public generally which includes the ignorant, the unthinking and incredulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions.  Thus, being mindful of the fact that the buying public does not weigh each word in an advertisement or a representation, the Court will consider the impression that is likely to be created upon the prospective purchaser.

Think Achievement Corp., 144 F. Supp. 2d at 1010 (telemarketing context).

That consumers were mislead is demonstrated by the many consumers who complained to Defendants and various consumer agencies that the acceptance certificate led them to believe that they were going to receive a major credit card.  That a large number of consumers did not complain or the fact that the FTC came forward with relatively few consumer declarations in support of its motion does not bar the court from entering judgment on this motion.  See Wilcox, 926 F. Supp. at 1099.  It is undisputed that Defendants, as well as the Better Business Bureau and the FTC, all received numerous complaints from consumers angry that they did not receive a major credit card.  Accepting as true the argument that those complaints were not the main complaints made by consumers does not negate or lessen that the implied representation was likely to, and in fact did, mislead other consumers. See FTC v. US Sales Corp., 785 F. Supp. 737, 748 (N.D. Ill. 1992) (stating that the FTC need

not show that every reasonable consumer would be mislead). Nor does the existence of some satisfied customers. See Wilcox, 926 F. Supp. 1091, 1099 (citing FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 572 (7th Cir. 1989)).

Finally, the representations made here are presumed material because they were made to induce consumers to send the Defendants money, i.e., the $45.00 fee or the $49.00 rush fee, in exchange for a product or service. See Wilcox, 926 F. Supp. at 1098 (providing that express claims or deliberately made implied claims used to induce the purchase of a particular product or service are presumed to be material). A fair reading of the acceptance certificate supports that the representations, express and implied, employed here were (and did) affect a consumer's choice in sending in the advance fee. Thus, the court finds that Defendants' representations were deceptive under § 5(a) of the FTC Act.

B.

Once [corporate] liability has been established, individual defendants may also be held liable for consumer redress where the FTC demonstrates that the individual defendants actively participated in or had some measure of control over the defendant corporation's deceptive practices and had or should have had knowledge or awareness of the misrepresentations. Amy Travel Serv., 875 F.2d at 573; Wilcox, 926 F. Supp. at 1104. As mentioned earlier, counsel for Mr. Olmstead and Ms. Connell informed the court at oral arguments that neither one was challenging individual liability in light of previous findings made by the district judge and the undersigned.[17] See (Doc. 444 at 43, 55). The

---

[17]On January 14, 2004, U.S. District Judge Elizabeth A. Kovachevich found that Mr. Olmstead and Ms. Connell exercised common control over PCF and CP. (Doc. 37 at 7, ¶ 12). On July 9, 2004, the undersigned found that a close and active relationship existed between Mr. Olmstead, Ms. Connell, and the LLCs. (Doc. 168 at 11).

16

uncontroverted evidence therefore establishes that Mr. Olmstead and Ms. Connell knowingly participated directly in the deceptive practices or acts at issue here or possessed the authority to control them, and there exists no genuine issue of material fact as to their individual liability with regard to the deceptive conduct of PCF and/or CP.  Both Mr. Olmstead and Ms. Connell are appropriately held individually liable for consumer redress.

C.

Section 13(b) of the FTC Act authorizes the district courts to grant permanent injunctions against practices that violate any of the laws enforced by the FTC.  15 U.S.C. § 53(b); FTC v. Gem Merchandising Corp., 87 F.3d 466, 468 (11th Cir. 1996).  Although Section 13(b) does not expressly authorize courts to award monetary equitable relief, the unqualified grant of statutory authority to issue an injunction thereunder carries with it the full range of equitable remedies, including the power to order equitable monetary relief for redress through remedies such as restitution or disgorgement.  Gem Merchandising Corp., 87 F.3d at 468-70.

Here, Plaintiff seeks an Order holding the Defendants jointly and severally liable for consumer redress in the amount of $10,156,700.40 (the total amount of money Defendants collected from consumers minus the refunds made).  To obtain restitution on behalf of consumers, the FTC must show consumer reliance but it is not required to show reliance and injury by each individual consumer.  FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1316 (8th Cir. 1991); FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605 (9th Cir. 1993) (Section 19 case); FTC v. Freecom Communications., Inc., 401 F.3d 1192, 1205 (10th Cir. 2005). A presumption of actual reliance arises where the FTC has demonstrated that the defendant made material misrepresentations, that they were widely disseminated, and that

consumers purchased the defendant's product or service.[18]  Figgie Int'l, 994 F.2d at 605-06; Freecom Communications, 401 F.3d at 1206.

By the undisputed evidence, Defendants made or caused to be made widespread misrepresentations upon which consumers relied in sending Defendants their $45 or $49 payment for the platinum card.  The Defendants' own records establish that the acceptance certificates were widely disseminated as approximately 10 million were mailed to consumers. Evidence also establishes that some 200,000 consumers responded to Defendants' solicitations and paid Defendants the money requested.  The undisputed net proceeds from Defendants' scheme is calculated at $10,156,700.40.  Thus, an Order directing the Defendants to redress consumers in this sum appears proper in this case.

Plaintiff also requests that the court permanently enjoin the corporate Defendants and Mr. Olmstead and Ms. Connell from engaging in similar deceptive conduct in the future. Because there is a danger of recurrent violations at the hands of Mr. Olmstead and Ms. Connell or their related entities under the same or similar guise, a permanent injunction against such is likewise appropriate.

---

[18]Restitution is determined by the amount paid by the consumers in the illegal scheme less any amounts previously returned to the consumers.  Gem Merchandising Corp., 87 F.3d at 467 (affirming an award of damages as calculated by consumers' losses and an order of disgorgement to the Treasury); Amy Travel Serv., 875 F.2d at 570 (affirming restitution award of $6,629,100, the amount consumers paid for travel certificates); FTC v. Renaissance Fine Arts, Ltd., 1995-2 Trade Cas. (CCH) ¶ 71,086 at 75,194 (N.D. Ohio 1995) (stating that generally the appropriate amount of restitution in consumer redress cases is the full purchase price of the product less the refunds paid).

IV.

For the reasons set forth above, **Plaintiff's Motion for Summary Judgment** (Doc. 261) is **GRANTED**, **Defendant, Shaun Olmstead's Motion for Summary Judgment** (Doc. 288) is **DENIED**, and **Consumer Preferred, LLC and People's Credit First, LLC Motion for Summary Judgment** (Doc. 296) is **DENIED**. The Clerk is directed to enter judgment in favor of Plaintiff. By this judgment, the Defendants, individually and severably, shall be liable for full restitution in the total amount of $10,156,700.40. Further, the Defendants shall be permanently enjoined from employing any false or deceptive means or act to promote, advertise, offer for sale, sell or otherwise provide to the consuming public any goods or services in return for the payment of an advance fee; and the judgment will reflect that the court retains jurisdiction of this cause for the purposes of determining an award of fees and costs, if any.

**Done and Ordered** in Tampa, Florida, this 18th day of December 2005.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record